# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

ANGELA CUMMINGS,

         Plaintiff,

 v.

VALLEY HEALTH SYSTEM, LLC, *et al.*,

         Defendants.

Case No. 13–cv–00479–APG–GWF

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

(Dkt. Nos. 76, 77)

Angela Cummings was employed at Desert Springs Hospital as a monitor technician and unit coordinator. She was repeatedly disciplined by multiple supervisors for infractions of the hospital's policies. Each time Cummings was disciplined, she complained to management and filed charges of discrimination with the Equal Employment Opportunity Commission, the Nevada Equal Rights Commission, and the Nevada Labor Commissioner. Neither management nor the agencies were able to substantiate her claims.

Cummings was eventually fired after three co-workers caught her watching videos on the hospital's intranet when she was supposed to be monitoring the telemetry rhythms of approximately 40 patients. She now sues the hospital and one of her co-workers, RaeJohne Foster, for a variety of state and federal claims. Because Cummings' claims are factually unsupported, I grant the defendants' motion for summary judgment and deny Cumming's motion for summary judgment.

## I.    BACKGROUND

In May of 2008, plaintiff Angela Cummings was hired by defendant Desert Springs Hospital Medical Center as a monitor technician and unit coordinator. (Dkt. #76, Ex. B. at 52.) Monitor technicians are responsible for monitoring patients' telemetry rhythms. (*Id.* at 59.) Unit coordinators perform clerical and reception duties. (*Id.* at 56.) Before beginning work,

1    Cummings attended an orientation and received an employee handbook, which outlined the

2    hospital's standards of conduct and progressive-discipline policy. (*Id.* at 53–54.)

3         The hospital's progressive-discipline policy consists of four levels: level-one counseling

4    involves an initial discussion with the employee; level-two counseling implements a

5    performance-improvement plan; level-three counseling consists of a final warning; and level-four

6    counseling results in the employee's termination. (*Id.* at Ex. F.)  The level of discipline to be

7    imposed is discretionary and based on the severity of the employee's infraction. (*Id.* at Ex. D.)

8         **A.**    ***First Infraction***

9         In October 19, 2011, the Director of Critical Care, Jim Zolnowski, gave Cummings a

10   level-one corrective action for violating the hospital's "service-excellence standards" by being

11   rude to another employee. (*Id.* at Ex. N.)  In accordance with the hospital's disciplinary policy,

12   Zolnowski gave Cummings a copy of the paperwork documenting the corrective action. (*Id.*)  She

13   reviewed the paperwork and signed an acknowledgement that she had received a copy. (*Id.*)

14   On May 7, 2012, Cummings sent a letter to the hospital's corporate office in

15   Pennsylvania, complaining that a co-worker, defendant RaeJohne Foster, repeatedly threatened

16   her with violence and harassed and humiliated her. (*Id.* at Ex. O.)  Wayne Cassard, the System

17   Director of Human Resources, investigated but was unable to substantiate Cummings'

18   allegations, and reported his findings to the hospital's CEO on June 5, 2012. (*Id.* at Ex. P.)

19        **B.**    ***Second Infraction***

20        On July 26, 2012, Zolnowski issued Cummings a level-two corrective action for violating

21   the hospital's timekeeping policy. (*Id.* at Ex. R.)  During the previous week, Cummings had

22   incurred overtime twice without obtaining a supervisor's approval. (*Id.*)  Zolnowski gave

23   Cummings a copy of the paperwork documenting the corrective action. (*Id.*)  She reviewed the

24   paperwork and did not dispute the violation, but refused to sign the acknowledgement that she

25   received a copy. (*See id.*)

26        On the same day, Cummings sent a second letter to the hospital's corporate office in

27   Pennsylvania. (*Id.* at Ex. T.)  This time she complained that Zolnowski had asked other

28

1   employees to "monitor" her work, that she was unfairly disciplined for violating the timekeeping

2   policy, and that she was not permitted to use the restroom when needed. (*Id.*)  Leslie Irwin, a

3   Human Resources Generalist at the hospital, investigated. (*Id.* at Ex W.)  Irwin interviewed

4   Zolnowski and four of Cummings' co-workers and concluded that Cummings' complaints were

5   unsubstantiated. (*Id.*)

6       **C.**    *The Third and Fourth Infractions*

7       On July 28, 2012, nurse Beena Thomas informed Zolnowski that Cummings was late to

8   work. (*Id.* at Ex. X.)  Thomas asked another monitor technician, who was scheduled to be in the

9   monitoring room with Cummings during her shift, to report when Cummings arrived to work.

10   (*Id.*)  Thomas subsequently located Cummings in another part of the hospital. (*Id.*)  Thomas

11   informed Cummings that she was late for work and drafted a letter to Zolnowski to document

12   Cummings' infraction. (*Id.*)  Zolnowski discussed the matter with Cummings, but chose not to

13   formally discipline her.

14       On July 31, 2012, the Nevada Equal Rights Commission ("NERC") notified the hospital

15   that Cummings had filed a charge of race and sex discrimination. (*Id.* at Ex. Y.)  NERC

16   subsequently closed the charge, finding that "the evidence presented did not meet the legal

17   criteria for establishing that discriminatory acts occurred." (*Id.* at Ex. Z.)  The Equal Employment

18   Opportunity Commission ("EEOC") adopted NERC's findings. (*Id.* at Ex. AA.)

19       On August 31, 2012, the Nevada Labor Commissioner notified the hospital that

20   Cummings filed a claim for unpaid wages. (*Id.* at Ex. CC.)  The Commissioner later determined

21   that no wage violation occurred. (Ex. A. at ¶ 8.)

22       On September 28, 2012, nurse Belan Verzosa issued Cummings a "level two corrective

23   action" for incurring 8.5 attendance-policy violations. (*Id.* at Ex. CC.)  Verzosa gave Cummings a

24   copy of the paperwork documenting the infractions, which Cummings reviewed and signed. (*Id.*)

25       **D.**    *Final Warning and Termination*

26       On November 23, 2012, nurse Thomas emailed Donna Adkins—who had replaced

27   Zolnowski as the Director of Critical Care—to inform her that the department cellphone, which

28

1  had been issued to Cummings during her shift, was missing. (*Id.* at Ex. DD.)  When the hospital

2  attempted to contact Cummings, it discovered that Cummings had changed her phone number

3  without updating her contact information with the hospital as required. (*Id.*)  Adkins investigated,

4  concluded that Cummings violated both policies, and issued her two "level two corrective

5  actions." (*Id.*)

6      On the same day that Cummings received those corrective actions, she also received a

7  third corrective action for 27 violations of the hospital's punctuality-and-attendance policy. (*Id.* at

8  Ex. EE.)  Those violations occurred between December 20, 2011 and December 14, 2012, and

9  resulted in a "level three corrective action," which was Cummings' final warning. (*Id.*)

10     On December 1, 2012, three telemetry technicians caught Cummings watching intranet

11  videos during her shift when she was supposed to be monitoring the telemetry rhythms of 40

12  patients. (*Id.* at Ex. PP.)  One of Cummings' co-workers, Joanne Ruiz, documented Cummings'

13  infraction in a letter. (*Id.*)  Another telemetry technician recorded Cummings watching the video

14  with a cellphone. (*Id.* at Ex. NN.)  Cummings later testified that she was watching a video about

15  infectious diseases. (Dkt. #82 at Ex. 3.)

16     On December 18, 2012, Cummings met with a member of the human resources

17  department to inform the hospital that she had filed additional charges with NERC and the EEOC.

18  (Dkt. #82-9 at Ex. 30.)  Cummings was upset with her 2012 holiday work schedule. (*Id.*)  She

19  also complained that she was unable to reach Adkins to discuss the matter. (*Id.*)

20     On January 11, 2013, Cummings was placed on leave for watching intranet videos during

21  her shift. (Dkt. #76 at Ex.GG.)  Kristopher Bolek, the new Director of Critical Care, investigated

22  and obtained a video that shows Cummings watching videos on a computer instead of monitoring

23  telemetry rhythms. (*Id.* at Ex. NN, II.)  On January 14, 2013, Bolek attempted to schedule a

24  meeting with Cummings to discuss his findings and give her an opportunity to respond. (*Id.* at

25  KK.)  Meanwhile, Cummings filed additional charges with the EEOC and Nevada Labor

26  Commissioner. (*Id.* at QQ, RR.)

27

28

On January 12, 2013, a security officer received a report that several employees heard Cummings say "if she gets fired she would come back and shoot up the place." (Dkt. #82-3 at Ex. 8.)  On January 30, 2013, Cummings met with Bolek and Yomi Fabiyi, the hospital's Human Resources Administrator. (Dkt. 76, Ex. at OO.)  Cummings refused to sit, called Bolek's questions silly, and repeatedly rolled her eyes. (*Id.* at Exs. B 232:13–233:21, OO.)  Fabiyi told Cummings that she could leave the meeting if she did not want to act in a professional manner. (*Id.* at Ex. OO.)  Cummings left. (*Id.*)  Her employment was subsequently terminated. (*Id.* at OO.)  Her charges with the EEOC and Nevada Labor Commissioner were dismissed. (*Id.* at RR.)

Cummings commenced this action against the hospital and Foster pleading: (1) race and sex discrimination under Title VII of the Civil Rights Act of 1964; (2) retaliation under Title VII; (3) race discrimination under 42 U.S.C. § 1981; (4) retaliation under § 1981; (5) wrongful discharge in violation of public policy ("tortious discharge"); (6) defamation; (7) wrongful interference with prospective economic advantage; (8) negligent training and supervision; and (9) injunctive relief.  (*See* Dkt. #35.)  I previously dismissed her race discrimination, negligent-training-and-supervision, and injunctive-relief claims. (Dkt. #48.)  I now grant summary judgment in defendants' favor on the remaining claims.

## II.   **ANALYSIS**

Summary judgment is appropriate if the pleadings, discovery responses, and affidavits demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine

1    issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.

2    2000).  I view the evidence and reasonable inferences in the light most favorable to the

3    nonmoving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

4        **A.    Cummings' Retaliation Claims[1] Fail.**

5        To establish a prima facie case of retaliation under Title VII a plaintiff must show that

6    "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3)

7    there was a causal link between her activity and the employment decision." *Raad v. Fairbanks N.*

8    *Star Borough Sch. Dist.*, 323 F.3d 1185, 1196–97 (9th Cir. 2003).  Here, the focus is on whether

9    there was a causal link between Cummings' protected activity and an adverse employment action.

10       To establish the causal link, the plaintiff must present "proof that the desire to retaliate

11   was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Cir. v.*

12   *Nassar*, —— U.S. ——, 133 S. Ct. 2517, 2528 (2013).  "This requires proof that the unlawful

13   retaliation would not have occurred in the absence of the alleged wrongful action or actions of the

14   employer." *Id*. at 2533.  "However, 'but-for' causation does not require proof that retaliation was

15   the only cause of the employer's action, but only that the adverse action would not have occurred

16   in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845-46

17   (2d Cir. 2013).  The Supreme Court recently explained "but-for" causation, including where a

18   result is caused by multiple factors:

19       Thus, where A shoots B, who is hit and dies, we can say that A actually caused
20       B's death, since but for A's conduct B would not have died.  The same conclusion
         follows if the predicate act combines with other factors to produce the result, so
21       long as the other factors alone would not have done so—if, so to speak, it was the
         straw that broke the camel's back.  Thus, if poison is administered to a man
22       debilitated by multiple diseases, it is a but-for cause of his death even if those
         diseases played a part in his demise, so long as without the incremental effect of
23       the poison, he would have lived.

24

25   ─────────────
         [1] Cummings pleads retaliation claims under Title VII, 42 U.S.C. § 1981 and Nevada Revised
26   Statutes § 613.340. (Dkt. 35 at ¶¶ 26, 41, 51.)  The parties argue, and I agree, that the same standard
     applies to each claim. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008) (stating that
27   section 1981 and Title VII retaliation claims are governed by the same standard); *Apeceche v. White Pine
     Cnty*, 96 Nev. 723, 726 (1980) (stating that section 613.340 and Title VII retaliation claims are governed
28   by the same standard).

1  *Burrage v. United States*, ⸺ U.S. ⸺, 134 S. Ct. 881, 888 (2014) (internal quotation marks

2  and citations omitted).

3  A plaintiff may prove that retaliation was a but-for cause of an adverse employment action

4  by showing the employer's explanation for the adverse actions was pretextual, such as by

5  "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

6  proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 845-46.

7  Additionally, causation "may be inferred from proximity in time between the protected action and

8  the allegedly retaliatory employment decision." *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir.

9  2000).

10  Cummings engaged in protected activity by complaining to the NERC and filing a charge

11  with the EEOC. The July 31, 2012 letter from the EEOC to the defendants notified them of her

12  protected activity. Cummings argues that the adverse employment actions she suffered—written

13  warnings, a suspension, and termination—were sufficiently close in time to her protected

14  activities to demonstrate a causal link.

15  Cummings offers insufficient evidence to support her allegation that her protected activity

16  was the but-for cause of her adverse-employment actions or that the defendants harbored a

17  retaliatory motive. Cummings argues that I should infer the existence of a causal link because

18  Fabiyi was hired by the hospital in September 2012 when "the retaliation against Plaintiff was

19  ratcheted up." There is no evidence in the record suggesting that Fabiyi harbored a retaliatory

20  motive for events that occurred before he was hired by the hospital, as Cummings argues. Nor

21  does Cummings explain why Fabiyi's hiring demonstrates a retaliatory motive.

22  Additionally, the defendants produced volumes of records—from before and after Fabiyi

23  was hired—documenting legitimate, nondiscriminatory reasons for the adverse-employment

24  actions. These include (1) a level-one corrective action issued by Zolnowski in May 2011

25  because Cummings was rude to another employee, (2) a level-two corrective action issued by

26  Zolnowski on July 26, 2012 because Cummings twice violated the hospital's timekeeping policy,

27  (3) a July 28, 2012 letter from Thomas to Zolnowski documenting Cummings' failure to appear

28

1   for her shift, (4) a level-two corrective action issued by Thomas on September 28, 2012 because

2   Cummings incurred 8.5 attendance infractions, (5) a November 23, 2012 email from Thomas to

3   Adkins documenting Cummings' failure to return her work cellphone at the end of her shift, (6) a

4   level-two corrective action issued by Adkins because Cummings failed to return the cellphone,

5   (7) a corrective action issued by Adkins for watching internet videos during her shift, and (8)

6   video footage of Cummings watching internet videos during her shift. (*See* Dkt. #76 at Exs. N, R,

7   X, CC, DD, GG, NN.)  Cummings presented no evidence raising an issue of fact that the reasons

8   for these actions were implausible or pretextual.

9        Cummings' retaliation claims are "factually unsupported" and "so one-sided that [the

10  defendants] must prevail as a matter of law." *Celotex Corp.*, 477 U.S. at 323–24; *Anderson*, 477

11  U.S. at 252.  I therefore grant summary judgment in the defendants' favor on Cummings'

12  retaliation claims.

13       **B.     Cummings' Tortious-Discharge Claim Fails.**

14       Under Nevada law, an employer generally may terminate an at-will employee for any

15  reason without liability for wrongful discharge. *Smith v. Cladianos*, 104 Nev. 67, 67 (1988).

16  Nevada recognizes an exception to this rule: an employer may not discharge an employee for a

17  reason that violates a strong public policy. *See Hansen v. Harrah's*, 100 Nev. 60, 63 (1984).  "To

18  prevail, the employee must be able to establish that the dismissal was based upon the . . .

19  employee's engaging in conduct which public policy favors." *Bigelow v. Billiard*, 111 Nev. 1178,

20  1182 (1995).  The employee's burden at trial is to prove that the protected conduct was the

21  "proximate cause" of her discharge. *Allum v. Valley Bank of Nev.*, 114 Nev. 1313, 1320 (1998)

22  (internal quotation marks and citations omitted).  This requires showing both foreseeability and

23  but-for causation. *See id.* at 1320 n.4

24       The Supreme Court of Nevada recognizes whistleblowing as "an established public policy

25  of this state." *Wiltsie v. Baby Grand Corp.*, 105 Nev. 291, 292–93 (1989) (per curiam).  To be

26  entitled to protection for whistleblowing, the employee must expose her employer's illegal

27  activity to the proper authorities. *Id.* at 293.  The conduct reported by the employee need not

28

1    actually be illegal. *Allum*, 114 Nev. at 1322.  The employee's reasonable, good faith suspicion

2    that her employer participated in illegal conduct is sufficient. *Id.*

3        Cummings engaged in whistleblowing by filing charges with the NERC, the EEOC, and

4    the Nevada Labor Commissioner.  However, there is no evidence that this activity was the

5    proximate or actual cause of the adverse-employment actions.  With regard to proximate cause,

6    the defendants produced volumes of records documenting legitimate, nondiscriminatory reasons

7    for Cummings' written warnings, a suspension, and termination.  Similarly, with regard to actual

8    cause, there is no evidence that Cummings' whistleblowing was the but-for cause of the adverse-

9    employment actions.  I therefore grant the defendants summary judgment on Cummings' tortious-

10    discharge claim.

11        **C.**    **Cummings' Gender-Discrimination Claim Fails.**

12        Title VII prohibits discrimination against an employee on the basis of gender. *See* 42

13    U.S.C. § 2000e–2(a).[2]  To prevail on a Title VII discrimination claim for disparate treatment,[3] a

14    plaintiff must establish a prima facie case by presenting evidence that "gives rise to an inference

15    of unlawful discrimination." *Cordova v. State Farm Ins. Co.*, 124 F.3d 1145, 3148 (9th Cir.

16    1997).  A plaintiff can establish a prima facie case through direct evidence or through

17    circumstantial evidence via the burden-shifting framework set forth in *McDonnell Douglas Corp.*

18    *v. Green,* 411 U.S. 792, 802 (1973).  *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007).

19        Under *McDonnell Douglas*, the plaintiff carries the initial burden of establishing a prima

20    facie case. *McDonnell Douglas*, 411 U.S. at 802.  To do so, the plaintiff must show that she (1)

21    belongs to a protected class, (2) was qualified for her position and performed her job

22    satisfactorily; (3) experienced an adverse employment action, and (4) similarly situated

23    _____

24        [2] The defendants concede that Cummings satisfied the administrative exhaustion requirements of
Title VII for both the discrimination and retaliation claims. (Dkt. #34 at 2.)

25        [3] Cummings also claims sex discrimination under the theory of disparate impact. (Dkt. #34 at ¶

26    11.)  However, her Title VII claims are properly construed as disparate treatment claims.  Disparate impact
arises when "some employment practices, [usually facially neutral,] adopted without a deliberately

27    discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson
v. Fort Worth Bank & Trust*, 487 U.S. 977, 988 (1988).  Cummings' allegation that the defendants

28    mistreated women is not facially neutral.

1    individuals outside her protected class were treated more favorably, or other circumstances

2    surrounding the adverse employment action give rise to an inference of discrimination. *Hawn v.*

3    *Exec. Mgmt, Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). If the plaintiff establishes a prima facie

4    case, "the burden of production, but not persuasion, then shifts to the employer to articulate some

5    legitimate, nondiscriminatory reason for the challenged action." *Id.* at 1155 (internal quotation

6    marks and citation omitted). If the defendant meets this burden, the plaintiff must then prove that

7    the defendant's proffered reasons for the termination are mere pretext for unlawful

8    discrimination. *Id.*

9            Cummings' claim fails as a matter of law because she did not perform her job

10   satisfactorily. There is no material dispute that she received numerous corrective actions between

11   May of 2011 and January of 2013 from multiple supervisors. She presents no evidence that these

12   corrective actions were pretextual. Additionally, Cummings testified during her deposition that

13   the defendants do not treat male employees more favorably than female employees. (Dkt. #76,

14   Ex. B at 118–19.) She testified that the basis of her gender-discrimination claim is that female

15   employees should get more bathroom breaks than males because of "[o]ur monthly cycle." (*Id.*;

16   *accord* Dkt. #82, Ex. 3 at 75–76.) I therefore grant defendants summary judgment on Cummings'

17   gender-discrimination claim.

18           **D.      Cummings' Defamation Claims Fail.**

19           "A defamation claim requires demonstrating (1) a false and defamatory statement of fact

20   by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3)

21   fault, amounting to at least negligence; and (4) actual or presumed damages." *Pope v. Motel 6*,

22   121 Nev. 307, 315 (2005). The defendant bears the burden of proving that a publication is

23   privileged. *Id.* at 318. Privileged communications include intra-corporate communications that

24   occur "in the regular course of the corporation's business." *Simpson v. Mars*, 113 Nev. 188, 191

25   (1997).

26           The Supreme Court of Nevada has not explained precisely what conduct falls within the

27   regular course of a corporation's business. But that court's general definition of conditional

28

1  privileges is informative and has been followed by the District of Nevada to assess the intra-

2  corporate privilege:

3      A qualified or conditional privilege exists where a defamatory statement is made
       in good faith on any subject matter in which the person communicating has an

4      interest, or in reference to which he has a right or a duty, if it is made to a person
       with a corresponding interest or duty.

5

6  *Circus Circus Hotels, Inc. v. Witherspoon*, 99 Nev. 56, 62 (1983), *cited in Hoff v. Walco Int'l*,

7  *Inc*., No. 3:11–cv–00623, 2013 WL 275298 at *2 (D. Nev. Jan. 23, 2013); *Swan v. Bank of Am.*

8  *Corp*., No. 2:07–cv–00217, 2008 WL 2859066 at *10 (D. Nev. Jul. 22, 2008).

9      "Whether a particular communication is conditionally privileged by being published on a

10 'privileged occasion' is a question of law for the court." *Witherspoon*, 99 Nev. at 62.  The

11 plaintiff can defeat the privilege by proving that "the defendant abused the privilege by

12 publishing the communication with malice in fact." *Id*.  The privilege may also be abused "by

13 publication in bad faith, with spite or ill will or some other wrongful motivation toward the

14 plaintiff, and without belief in the statement's probable truth." *Id*. at 62 n.2.  These forms of abuse

15 echo the Restatement (Second) of Torts, which provides that a publisher forfeits a conditional

16 privilege if she "knows the matter to be false, or . . . acts in reckless disregard as to its truth or

17 falsity," or she commits "excessive publication." RESTATEMENT (SECOND) OF TORTS §§ 600, 604

18 (1977).  The test for excessive publication is whether the publisher "could have done all his

19 interest or duty demanded without defaming the plaintiff." *Id*. at § 604.

20     Cummings alleges three defamatory statements: (1) Foster's statement "to several

21 managers including those in the Desert Springs Hospital HR department" that Cummings had

22 violated company policy by browsing the internet on a company computer during work hours; (2)

23 Foster's statement to Adkins that Cummings called in threats to the hospital; and (3) Adkins'

24 statement to the telemetry department, in the presence of Bolek, that the door lock to the

25 telemetry department was changed because Cummings called in threats.  Cummings argues that

26 each statement was made with malice, that the corporate defendants ratified the first statement,

27 and that Foster knew that both of her statements were false.  She also argues that defendants'

28

assertion of the intra-corporate privilege as an affirmative defense is an admission that the defendants made defamatory statements.

Each of the statements, even if false, is privileged.  Each was made between co-workers: Foster to management, Foster to Adkins, and Adkins to the telemetry department (in Bolek's presence). (*See* Dkt. #76 at Exs. K 88:3–10; V 54:18–20; HH; II.)  Cummings concedes that Foster's statements were made in the regular course of the hospital's business because an employee's reporting of a co-worker's alleged company-related wrongdoing is something that normally occurs within a business. (Dkt. #48 at 14.)  Complaints of the sort made by Foster are necessary antecedents to an internal corporate investigation and necessary to corporate and employee security. *Hoff*, 2013 WL 275298 at *2.  Similarly, Cummings concedes that Adkins' statement was made in the regular course of business. (Dkt. #48 at 14.)  Employees in the telemetry department, where Cummings worked, have a direct interest in knowing that the door locks have been changed and that one of their former co-workers has made threats—for their and the company's security if they ever encounter Cummings again.

Nor is there a genuine dispute that the statements were made in good faith.  Each statement was made in the regular course of the hospital's business or in the furtherance of the hospital's security interests. (*See* Dkt. #76 at Exs. K 88:3–10; V 54:18–20; HH; II.)  The only document Cummings proffers to show that the statements were made with actual malice is her own declaration, which states "[t]he statement was made with malice and it was a statement that tended to harm me in my trade, occupation, business, or profession." (Dkt. #82-1 at ¶ 28.) Because this is a legal conclusion, and not evidence, there is no genuine issue of material fact and defendants are entitled to summary judgment on Cummings' defamation claims.  For these same reasons, Cummings' motion for partial summary judgment on the defendants' affirmative defense of privilege (Dkt. #77) must be denied.

**E.     Cummings' Wrongful Interference Claim Fails.**

Cummings' ninth claim alleges wrongful interference with prospective economic advantage against defendant Foster.  This claim has five elements:

(1) a prospective contractual relationship between the plaintiff and a third party;
(2) the defendant's knowledge of this prospective relationship; (3) the intent to
harm the plaintiff by preventing the relationship; (4) the absence of privilege or
justification by the defendant; and, (5) actual harm to the plaintiff as a result of
the defendant's conduct.

*Leavitt v. Leisure Sports Inc.*, 103 Nev. 81, 88 (1987). "'The interference with the other's

prospective contractual relation is intentional if the actor desires to bring it about or if he knows

that the interference is certain or substantially certain to occur as a result of his action.'"

*Las Vegas–Tonopah–Reno Stage Line, Inc. v. Gray Line Tours of S. Nev.*, 106 Nev. 283, 288

(1990) (quoting RESTATEMENT (SECOND) OF TORTS § 766B(d) (1977)).  Similar to the defamation

context, privileged communications "cannot be used to prove an interference with a prospective

business relation claim unless the privilege is abused by bad faith, malice with spite, ill will, or

some other wrongful motivation, and without belief in the statement's probable truth." *Bank of*

*Am. Nev. v. Bourdeau*, 115 Nev. 263, 267 (1999).

Cummings' wrongful interference claim fails because there is no evidence that Foster

desired Cummings' termination or was substantially certain that Cummings would be terminated

because Cummings watched intranet videos during her shift.  This claim also fails because

Foster's statement that Cummings neglected her duties was justified by ordinary business

activities.  As stated above, a report by one employee that another employee may have engaged in

company-related wrongdoing is justified by the company's legitimate business interest.  I

therefore grant defendants summary judgment on this claim.

## III.   CONCLUSION

IT IS HEREBY ORDERED that the defendants' motion for summary judgment **(Dkt.**

**#76) is GRANTED** and Cummings' motion for partial summary judgment **(Dkt. #77) is**

**DENIED.**  The Clerk of Court shall enter judgment in favor of Valley Health System, LLC d/b/a

Desert Springs Hospital and RaeJohne Foster against plaintiff Angela Cummings.

DATED this 11th day of February, 2016.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE